UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| LINDA HULST, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 12-344-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| AETNA LIFE INSURANCE | ) | **MEMORANDUM OPINION** |
| COMPANY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Linda Hulst was employed as a marketing executive with Marriott International, Inc. ("Marriot") in Hawaii until March 30, 2011. At all relevant times, Hulst was covered under Marriot's group LTD plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Defendant Aetna Life Insurance Company ("Aetna") provides LTD coverage to Marriott in addition to administering the Plan. Hulst seeks review of Aetna's denial of her claim for long-term disability ("LTD") benefits under an employee disability benefit program (the "Plan")[1] sponsored by Marriot under 29 U.S.C. § 1132(a)(1)(B). Both parties have filed motions for judgment. [Record Nos. 29, 30] Hulst alleges that Aetna's decision is arbitrary and capricious. Conversely, Aetna argues that its decision is supported by

---

[1]    References to the administrative record are designated as "AR" and references to the Aetna Policy at issue are designated as "Policy." [*See* Record Nos. 17, 18.]

substantial evidence and should be affirmed. [Record No. 29]  For the reasons that follow, judgment will be entered in favor of Aetna.

## I.

The Plan delegates to Aetna the discretion to make benefit determinations and to interpret the terms of the Plan.  [*See* Policy, p. 63; *see also* Record No. 29-1, pp. 1-2; Record No. 30-1, p. 8-9.]

The Plan defines "disability" as:

From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the **test of disability** on any day that:

- You cannot perform the **material duties** of your **own occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition; and

- Your earnings are 80% or less of your **adjusted predisability earnings**.

After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition.

[Policy, p. 8 (emphasis in original)]

Additionally, "Own Occupation" is defined in the Plan as:

The occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:

- For your specific employer; or

- At your location or work site; and

- Without regard to your specific reporting relationship.

[Policy, p. 26]

Hulst claims that while she was an employee of Marriott she became disabled due to fibromyalgia, fatigue, and depression. She subsequently filed a claim for LTD benefits with Aetna. Aetna conducted a clinical review and physician peer review. During its investigation of the plaintiff's claim, Aetna determined that the evidence of record did not support any restrictions, limitations, or impairments that would prevent Hulst from performing her own occupation. By letter dated September 22, 2011, Aetna informed Hulst that her claim had been denied because the evidence did not support her assertion that she was unable to work at her own occupation. [AR, p. 130-32] She then appealed Aetna's determination. [AR, 58-59]

Hulst was afforded the opportunity to supplement the administrative record prior to Aetna's appellate review of its initial denial of LTD benefits. After Hulst supplemented the record, Aetna again reviewed the full the record and sought the opinions of two additional consultative physicians. As part of this review, both peer-to-peer conversations and written responses were elicited from Hulst's treating physicians. On May 16, 2012, Aetna again determined that the evidence did not support Hulst's claim that she was unable to perform her own occupation and upheld its denial of benefits.

Hulst filed this action on November 14, 2012, alleging that Aetna's decision to deny LTD benefits was arbitrary, capricious, and unsupported by substantial evidence. Hulst contends that she is disabled under the terms of the Plan and seeks reversal of Aetna's decision with reinstatement of benefits, including past due benefits. [Record No. 30]

## II.

**A.     Standard of Review**

ERISA itself does not specify a standard of review.  Generally, a challenge to an ERISA denial of benefits is reviewed *de novo*.  *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  However, if the plan in question grants the plan administrator discretionary authority to determine benefit eligibility, such determination will be upheld unless it is arbitrary or capricious.  *Id.*  Here, the parties do not dispute that the Plan grants such discretion to Aetna.  Likewise, the parties have stipulated that the Court should apply an arbitrary or capricious standard to Aetna's denial of LTD benefits.  [Record No. 21]

The arbitrary and capricious standard is the "least demanding form of judicial review." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011) (internal quotation marks omitted).  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).  Essentially, "the Plan Administrator's decision should be rational in light of the plan's provisions." *Farhner*, 645 F.3d at 342 (internal quotation marks omitted).

Although this standard is highly deferential, "the arbitrary-and-capricious standard . . . does not require [the court] merely to rubber stamp the administrator's decision."  *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)).  Rather, it reviews "the quality and quantity of the medical

evidence on both sides of the issue" to determine whether the administrator's decision was arbitrary and capricious. *Id.* (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003)). Finally, the "ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

The administrator's decision will be upheld if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn*, 461 F.3d at 666. This standard "equates to the substantial-evidence standard used to review Social Security disability decisions." *Creech v. Unum Life Ins. Co. of N. Am.*, 162 F. App'x 445, 448 (6th Cir. 2006). Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). While substantial deference is given, the standard employed in these cases does not permit a selective reading of the record. Instead, "[s]ubstantiality of the evidence must be based upon the record taken as a whole" and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (citations and internal quotation marks omitted).

The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (citations and internal quotation marks omitted). If supported by substantial evidence, the administrator's decision will be affirmed

even if the Court would decide the case differently and even if the plaintiff's position is also supported by substantial evidence. *See Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 555 (6th Cir. 1995); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989).

### B.    Conflict of Interest

The deferential "arbitrary and capricious" standard is "tempered by any possible conflict of interest where the Plan Administrator both determines eligibility and funds the Plan." *Farhner*, 645 F.3d at 342 (internal quotation marks omitted). There is a conflict of interest when a plan authorizes an administrator "both to decide whether an employee is eligible for benefits and to pay those benefits." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (citation omitted). The existence of a conflict of interest is a factor that is taken into account in determining whether Aetna's decision was arbitrary and capricious. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292-93 (6th Cir. 2006). However, a conflict of interest does not alter the applicable standard of review. *See Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006); *see also Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311-12 (6th Cir. 2010); *Vochaska v. Metro. Life Ins. Co.*, No. 1:12-cv-1070, 2014 WL 222116, at *6 (W.D. Mich. Jan. 21, 2014). Instead, it is simply one consideration the Court weighs in its review. *Id.*

Additionally, in evaluating a conflict, the Court must "look[] to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). For instance, a conflict of interest is

weighed more heavily "where circumstances suggest a higher likelihood that it affected the benefits decision." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (describing, as an example, a situation "where an insurance company administrator has a history of biased claims administration"). The burden is on the plaintiff to demonstrate any such influence. *Smith,* 450 F.3d at 260. Here, Hulst has failed to provide any evidence to support a conclusion that Aetna's conflict of interest actually motivated its denial of benefits. Regardless, the mere existence of this conflict does not render Aetna's decision arbitrary and capricious. While the Court considers that a conflict of interest may exist, it does not give great weight to this factor.

## III.

Hulst claims that Aetna acted arbitrarily "in its exclusive reliance upon a [sic] non-examining medical consultants" in determining that she is not disabled. [Record No. 30-1, p. 10] Additionally, she maintains that Aetna acted arbitrarily and capriciously by failing to meaningfully consider the Social Security Administration's disability determination. [*Id.*, pp. 10-21] Conversely, Aetna asserts that its decision to deny benefits was well-reasoned and based on substantial evidence. The company also argues that Hulst is asking the Court to improperly re-weigh evidence and ignore the deference to which its decision is entitled. As explained more fully below, a review of the administrative record supports the conclusion that Aetna's decision was neither arbitrary nor capricious.

### A.     Medical History & Application for LTD Benefits

Hulst was first diagnosed with fibromyalgia by Dr. Gabino Baloy on March 30, 2011. [AR, p. 273] Prior to this diagnosis, Dr. Baloy had examined the plaintiff on five occasions

within the previous year for complaints of back pain and hypothyroidism. [AR, pp. 268-72] Dr. Baloy continued to see Hulst an additional seven times following his diagnosis of fibromyalgia, with the last exam occurring on August 31, 2011. [AR, pp. 274-80] During each exam, Dr. Baloy confirmed that she had no neurological deficit and that she had good judgment, insight, orientation, recent and remote memory, mood, and affect. [AR, pp. pp. 268-80]

On May 17, 2011, Hulst also began seeing rheumatologist Dr. Ken C. Arakawa. [AR, pp. 251-52] Following his first examination of the plaintiff, Dr. Arakawa reported that evidence of seronegative spondyloarthropath and connective tissue diseases was unremarkable. He noted that, despite Hulst's guarded movement and expressed tenderness, test findings were negative. [AR, p. 251] Dr. Arakawa also ordered various lab tests and x-rays, all of which were normal or negative. [AR, p. 252] Despite these unremarkable results, Dr. Arakawa diagnosed the plaintiff with osteoarthritis, fatigue, and depression. [*Id.*] He found these diagnoses to be consistent with fibromyalgia and prescribed medication for Hulst's complaints of pain. [*Id.*] However, by August 1, 2011, as a result of Hulst's reported negative side effects to five separate pain medications, Dr. Arakawa referred her to pain management specialist Dr. Jeffrey Wang. [AR, p. 256]

At Hulst's request, Dr. Arakawa prepared an Attending Physician Statement ("APS") and other disability claim forms on August 2, 2011. [AR, pp. 246-50] Dr. Arakawa reported that Hulst had suffered from severe back pain for several years and was unable to work as of May 17, 2011. [*Id.*] He attributed her impairment to fibromyalgia and osteoarthritis. [AR, p. 246] Dr. Arakawa further stated that Hulst could occasionally (up to one third of the day) reach, carry,

bend, twist, sit, stand, stoop, walk, and lift no more than five pounds. [AR, p. 250] Despite these findings, he noted that Hulst was not motivated to return to work. [AR, p. 249]

On August 3, 2011, Hulst applied for LTD benefits under the Plan and provided Dr. Arakawa's APS in support. [AR, pp. 477-91] On August 26, 2011, as part of Aetna's initial claim review, a clinical consultant reviewed Hulst's medical records. [AR, pp. 40-43] Despite Dr. Arakawa's assessment, this review concluded that the clinical information failed to support the restrictions and limitations submitted. [AR, p. 42] And despite Hulst's reports of diffuse body and joint pain and radiology reports showing degenerative changes in the cervical and lumbar spine, the exam findings did not correlate with any functional impairment in the hands. [Id.] Finally, the review noted that: (i) the reported fibromyalgia tender points were not qualified; (ii) examinations established no active synovitis in upper or lower extremities; and (iii) lab tests were essentially unremarkable. [Id.] Additionally, on September 7, 2011, a vocational assessment of Hulst's occupation was conducted as part of Aetna's review of her claim. [AR, p. 48-49] Ultimately, the assessment classified her marketing executive position as requiring only light physical activity.[2] [Id.]

On September 9, 2011, Aetna submitted Hulst's medical records to consultant physician, Dr. Carl J. VanderPutten, D.O., for review. [AR, pp. 282-83] Dr. VanderPutten contacted the Hulst's treating rheumotologist, Dr. Arakawa, to discuss his previous findings and the plaintiff's ailments. [Id.] Dr. Arakawa stated that he had transferred Hulst to Dr. Wang's care due to the plaintiff's continued self-reports of negative side effects of the medications he had prescribed.

---

[2]     Nonetheless, subsequent peer reviews found that the plaintiff's individual marketing executive occupation with Marriott was a medium demand position. [*See, e.g.*, AR, pp. 230-34, 324-27, 328-334.]

[*Id.*]  When Dr. VanderPutten inquired whether there were any physical objective findings that support Hulst's claimed disability, Dr. Arakawa's responded that she "is disabled because she says she id [sic] disabled."  [AR, p. 283]  Dr. Arakawa also indicated that her subjective trigger points were consistent with fibromyalgia.  [*Id.*]  In review, Dr. VanderPutten concluded that there was no objective evidence to support the conclusion that Hulst lacks the physical capacity to work.  [*Id.*]

On September 22, 2011, Aetna informed Hulst that her LTD application was denied. [AR, pp. 130-32]  It indicated that, based on her medical records, there was no objective evidence to establish a lack of Hulst's physical capacity to work.  [AR, pp. 130-31]  She was informed of her appeal rights.  Hulst was also instructed that she could submit additional evidence in support of her claim.  [*Id.*]  Hulst appealed the denial of her LTD claim on October 28, 2011.  [AR, pp. 58-59, 288-89]

Hulst subsequently provided updated medical information consisting of an APS from occupational and rehabilitation specialist Dr. D. Scott McCaffrey.  [AR, pp. 69-72, 76, 288-89, 300-10]  Although his records indicate that Dr. McCaffrey began treating Hulst in July 2011, Hulst did not initially list him as a medical source in her LTD claim.  It appears that the plaintiff's first appointment with Dr. McCaffrey was a follow-up regarding injuries from an unrelated car accident in 2006.  Dr. McCaffrey noted that the plaintiff displayed no acute distress and appeared to be in mild pain, guarding the area of injury from 2006.  [AR, p. 301]  He diagnosed Hulst with cervical disc disease (*i.e.*, a bulging disc) following her July 2011 examination.  [AR, p. 302]

Dr. McCaffrey continued to see Hulst and, on October 7, 2011, he completed an APS, finding her unable to work. [AR, pp. 285-87] By letter dated November 21, 2011, Dr. McCaffrey summarized the plaintiff's conditions as: (i) acute and chronic cervical sprain with disc derangement and instability; (ii) acute and chronic thoracic sprain with severe myospasm; (iii) disc derangement with facet arthrosis; (iv) myospastic cephalgia related to the cervical sprain; (v) fibromyalgia with recurrent paroxysmal pattern; (vi) pain-related sleep disorder; and (vii) reactive depression. [AR, pp. 309] He concluded by stating, "I support this woman in obtaining long-term disability coverage, which has been recalcitrant in large part to medical intervention." [AR, p. 309]

On September 29, 2011, Hulst saw Dr. Wang for the first time upon referral from Dr. Arakawa. Dr. Arakawa concluded that, because Hulst has reported side effects to all the medications that are usually "effective for fibromyalgia," she is a candidate for chronic pain management. [AR, p. 256] During her appointment with Dr. Wang, the plaintiff reported symptoms including anxiety, poor concentration, fatigue, and high levels of pain in her neck, back, and right hip. [AR, pp. 295-97] Dr. Wang concurred in the diagnosis of fibromyalgia and recommended that she try a low dose of methadone, a home regimen of physical therapy, and a weight reduction program. [AR, pp. 295-98] Dr. Wang also recommended that Hulst undergo a physical evaluation and functional assessment. However, physical therapist Michael Maresca concluded that the plaintiff was a poor candidate for therapy at that time because of her reported complaints of pain with almost all motions and attempted activity. [AR, p. 299] Maresca instructed Hulst to stretch and walk daily and consider physical therapy in the future. [*Id.*]

Hulst reported continuing issues with pain during a follow-up evaluation with Dr. Arakawa on October 3, 2011. Dr. Arakawa instructed Hukst to try the medications prescribed by Dr. Wang. Dr. Arakawa also confirmed his diagnosis of fibromyalgia. [AR, p. 257] He noted that physical examination:

> formally shows the patient to be in moderate degree of distress. She appears fatigued. HEENT, pulmonary and cardiac exam unremarkable. No rashes are seen. I am not able to detect synovitis in the upper or lower extremities. There is moderate guarding to full range of motion of the cervical spine in all planes, as well as the lumbar spine. She has all 18 of the fibromyalgia tender points as defined by the ACR criteria. She ambulates with a moderate degree of shuffling gait.

[AR, p. 257] Dr. Arakawa concluded that Hulst was unable to work. [*Id.*] Despite this determination, Dr. Arakawa did not provide any specific functional limitations. [*Id.*] Likewise, his medical notes do not indicate any type of restrictions, limitations, or findings that suggest Hulst's functionality was limited. [*See* AR, pp. 251-57]

On October 4, 2011, podiatrist Dr. Gregory Morris evaluated Hulst's right heel pain since July 2007. [AR, p. 320] When informing Dr. Morris of her bilateral foot pain, Hulst also stated that she received multiple cortisone injections for a neuroma while on the mainland.[3] [*Id.*] Hulst further reported that she is limited to walking only fifteen minutes at a time due to pain. [*Id.*] Following a physical exam, Dr. Morris noted that Hulst did not appear to be in distress, had minimal pain in her heels and a good range of motion of her ankles, and that the neurologic exam findings were normal. [*Id.*] He also found that Hulst was suffering from endoscopic plantar fasciotomy in her left foot. Dr. Morris recommended that Hulst wear supportive running shoes

---

3       Hulst did not provide any medical records regarding her treatment with cortisone shots.

and suggested a cortisone injection for the reported pain.  [*Id.*]  However, Hulst declined the cortisone treatment.  [AR, pp. 321-22]

Hulst contacted Aetna on January 24, 2012, stating that she had provided all records from her treating physicians.  [AR, p. 76]  Despite this representation, Hulst had not yet obtained any records from a psychologist she visited in September 2011.  However, Hulst stated that she would obtain those records.  While Hulst felt that her memory also suffered, she confirmed that she had not undergone any neuropsychological testing and did not claim any disability due to a mental health condition.[4]  [*Id.*]

Once the administrative record was supplemented, Aetna requested that Dr. Russell Green, a specialist in preventive and occupational medicines, conduct an independent review of her file.  [AR, pp. 328-34]  Dr. Green also conducted peer-to-peer conferences with Dr. Wang and unsuccessfully attempted to contact Dr. McCaffrey on numerous occasions.  [AR, pp. 90, 332]  Dr. Wang stated that he did not believe Hulst was "truly disabled" but that she focused on pain and sickness.  [AR, p. 332]

---

4       Hulst eventually provided Aetna with a Behavioral Health Screening conducted by clinical psychologist Warren Loos, Ph.D.  [AR, pp. 79, 323-27]  Dr. Loos' notes indicate that he reviewed the plaintiff's medical history and pain and discussed her treatment with Dr. Wang.  Aetna had psychologist Leonard Schnur, Psy.D., conduct a physician review regarding any psychological impairment. [AR, pp. 324-27] He concluded that there was a lack of examination findings to substantiate any psychological impairment precluding Hulst from performing her own occupation. [AR, p. 326] Dr. Schnur also found that even though the records mentioned a diagnosis of pain disorder due to psychological factors and emotional distress, the record did not include any formal measurement of cognitive or emotional functioning to support the presence of a psychological impairment that would preclude the plaintiff from performing her own occupation.  [*Id.*] He further concluded that the there was no evidence supporting any adverse effects from medication that impacted the plaintiff's functionality from either a physical or cognitive standpoint.  [*Id.*]  Dr. Schnur determined that no restrictions or limitations from a psychological standpoint were justified because the functional impairments were not substantiated.  [*Id.*]

Based on his review of the entire file and discussion with Dr. Wang, Dr. Green concluded that the evidence did not support any finding of functional impairment from March 31, 2011 to February 29, 2012. [AR, p. 333] Although Dr. Green acknowledged that Hulst may be depressed and have degenerative changes in her neck and back, there were no indications from Dr. Arakawa, Dr. Baloy, or Dr. McCaffrey to support a finding of functional impairment that prevented the plaintiff from performing her job. [*Id.*] He also found that there was no evidence to support an adverse side effect diagnosis for the alleged period of disability. [AR, p. 334] Thus, Dr. Green concluded that Hulst was not restricted from performing her own occupation. [AR, p. 333]

Moreover, prior to reaching a final determination regarding Hulst's appeal, Dr. McCaffrey received and reviewed Dr. Green's report. [AR, p. 156] On March 17, 2012, Dr. McCaffrey provided a written response which indicated that a non-biased physician evaluation would be appropriate and that he would send Hulst for a functional capacity evaluation ("FCE"). [AR, p. 335-36] Dr. McCaffrey did not refute Dr. Green's conclusion that the records did not support any functional impairment, other than listing the plaintiff's diagnoses. [*Id.*] Aetna placed Hulst's appeal review on hold until an FCE could be completed based upon Dr. McCaffrey's recommendation. [AR, p. 158]

On March 29, 2012, Hulst informed Aetna that she would not undergo the FCE because the relevant information was already in the record in the form of physical therapy notes and Dr. Wang's evaluation, and the FCE therefore would be duplicative. [AR, p. 99] Hulst also asserted that she could not afford an FCE and that, because of her impending move to Michigan, she

would be unable to stay in Hawaii for the evaluation.  [*Id.*]  In response, Aetna recommended that Hulst locate a doctor in Michigan to perform a FCE.  [*Id.*]  Alternatively, Aetna offered to have Hulst's records and the new information from Dr. McCaffrey again reviewed and to conduct a peer-to-peer discussion Dr. Arakawa.  Ultimately, Hulst agreed to this approach in lieu of an FCE.  [*Id.*]

Dr. Green subsequently attempted to reach Dr. Arakawa.  [AR, pp. 112-13, 232]  On April 24, 2012, Dr. Arakawa left Dr. Green a message stating that he could not comment on Hulst's functional status because he had not seen her since December 2011 and that her care had been transferred to Dr. Wang.  [*Id.*]  Dr. Green conducted a second review of the record, including Dr. McCaffrey's response to his report.  [AR, pp. 230-34]  Dr. Green again concluded that there was insufficient medical evidence to support an impairment finding from September 29, 2011 through April 18, 2012.  [*Id.*]  In reaching this determination, Dr. Green indicated that Dr. McCaffrey planned to get the plaintiff an FCE, which "should be of assistance to [...] Hulst and her physicians."  [AR, p. 233]  Dr. Green also stated that Dr. Wang doubted the plaintiff's claimed disability and that Dr. McCaffrey was unable to point to any specific limitations.  [AR, pp. 230-34]  Further, he determined that, while the plaintiff had been diagnosed with a number of conditions, there was insufficient evidence to support any actual functional imitation.  [AR, p. 232]

In an attempt to obtain additional information concerning Hulst's claimed disabilities, Aetna provided Dr. Green's findings and conclusions to Dr. Arakawa.  [AR, p. 228]  Aetna then

requested that Dr. Arakawa respond to Dr. Green's conclusion, participate in a peer-to-peer discussion with Dr. Green, or both. [*Id.*] This request went unanswered by Dr. Arakawa.

On May 16, 2012, Hulst informed Aetna that she had been awarded disability benefits from the Social Security Administration ("SSA"). [AR, p. 111][5] Aetna issued its unfavorable appeal determination the same day, upholding the initial denial of Hulst's LTD claim. [AR, pp. 164-67] Although Aetna considered Hulst's award of disability benefits from the SSA, it stated that the decision was not controlling. In relevant part, it pointed out that the SSA applied a different standard and criteria for disability than those required under the Plan.

## B.     Aetna's Determination

Aetna's unfavorable decision followed a full and fair review of Hulst's claim. The decision is supported by substantial evidence in the administrative record, including: (i) multiple physician reviews of the record; (ii) discussion and correspondences with Hulst's treating physicians; and (iii) Aetna's allowance of additional information and documentation.

Hulst contends that, based upon the opinions of three separate treating physicians (Drs. Arakawa, McCaffrey, and Wang), she is actually disabled by fibromyalgia and osteroarthritis under the Plan's "own occupation" definition of disability. Additionally, she maintains that Aetna acted arbitrarily and capriciously in its "exclusive reliance" upon non-examining consultants. [Record No. 30-1, pp. 10-18; Record No. 33, pp. 1, 4-7] She also accuses Aetna of "cherry picking" medical records in an effort to support its decision. However, these arguments are unpersuasive.

---

5       Hulst did not provide the SSA findings to Aetna. [AR, p. 167]

ERISA requires that a plaintiff whose claim has been denied must be afforded a "reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). To provide a plaintiff with a "reasonable opportunity" for a "full and fair" review of a claim determination, the claims procedures must provide that, when "deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). As noted above, Aetna received the opinions of multiple health care professionals prior to rendering a final determination to deny Hulst's claim. Hulst does not appear take issue with this, but instead contends that Aetna acted arbitrarily and capriciously by adopting the opinions of non-examining physicians over her treating physicians' opinions. Hulst also argues that Aetna's failure to conduct an in-person examination renders its decision arbitrary and capricious. [Record No. 30-1, pp. 15, 16, 18]

A claim administrator does not abuse its discretion by denying benefits where the administrative record contains conflicting medical opinions regarding the claimant's alleged disability. *See McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). Instead, it is the claim administrator's responsibility to resolve conflicts between medical opinions in assessing the validity of a plaintiff's claim for LTD benefits. *Id.*; *see also Elliot v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir. 1999). Further, a claim administrator is not required to give deference to the opinions of a plaintiff's treating physician over the opinions of its own

consulting physicians and the opinions of a treating physician are not entitled to a presumption of deference when evaluating the propriety of the denial of benefits under ERISA. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also McDonald*, 347 F.3d at 169. But Aetna may not summarily reject a treating physician's opinion, but must provide reasons for adopting an alternative opinion. *See Elliot*, 473 F.3d at 620.

Although Aetna's reliance on non-examining physicians is not a *per se* error, its failure to obtain an in-person examination weighs against a finding that Aetna's review was full and fair. The parties do not dispute that Aetna had the discretion to have a physician of its choice examine Hulst. Specifically, the Plan provides that:

> Aetna will have the right and opportunity to have a physician of its choice examine any person who is requesting certification of benefits for new or ongoing claims. Multiple exams, evaluations and functional capacity exams may be required during your disability for an ongoing claim. This will be done at all reasonable times while certification or a claim for benefits is pending or under review. This will be done at no cost to you.

[Policy, p. 21] And while Aetna did not conduct an independent medical examination ("IME") of the plaintiff, the Plan language does not require the performance of an IME.

Aetna also points to Hulst's failure to undergo an FCE, as recommended by Dr. McCaffrey. [Record No. 32, p. 9] It maintains that Hulst "refused" to submit to an FCE. [Record No. 32, p. 9 (citing AR, p. 99)] This argument misconstrues the record. The plaintiff did not refuse to undergo an FCE. Rather, she stated that she believed that all the relevant information was already in the administrative record. Additionally, Hulst advised Aetna that "she [did] not have the money (about $600[.00]) to complete this FCE" and that "she is moving this weekend to [Michigan]." [AR, p. 99] The claims note further states that "if [Aetna] still

want[s] her to do the FCE, she will have to find a doctor in Michigan to treat her and then to recommend her FCE." [*Id.*] The claim administrator then informed Hulst that "a new doctor most likely will not support her disability from 09/29/11, because he has not treated her during that time." [*Id.*] The Court is persuaded by Hulst's representation that her failure to obtain an FCE was the result of monetary restraints coupled with her impending move from Hawaii. However, the absence of the requested FCE from the administrative record does not weigh against Aetna's determination.

Hulst also takes further issue with Aetna's reliance on non-examining consultants in determining her disability status. But there is "nothing inherently objectionable" concerning a file review by a qualified physician under ERISA. Instead, this fact is one of the factors a court may consider in determining whether a claim administrator acted arbitrarily or capriciously. *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005). The Sixth Circuit has explained that "the failure to conduct a physical examination — especially where the right to do so is specifically reserved in the plan — may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005); *see also Judge v. Metro. Life Ins.*, 710 F.3d 651, 663 (6th Cir. 2013) ("A plan administrator's decision to conduct a file-only review might raise questions about the benefits determination, particularly where the right to conduct a physical examination is specifically reserved in the plan.").

File-only reviews have also been viewed unfavorably where the reviewer renders credibility determinations or the plan administrator unreasonably credits the file reviewer's

opinion over that of the treating physician without evidentiary support. *Judge v. Metro. Life. Ins. Co*, 710 F.3d 651, 663 (6th Cir. 2013); *see also Hunter v. Life Ins. Co. of N. Am.,* 437 F. App'x 372, 378 (6th Cir. 2011) ("The failure to perform a physical examination is one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." (citations omitted)); *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008); *Zenadocchio v. BAE Sys. Unfunded Welfare Benefit Plan,* 936 F. Supp. 2d 868, 889 (S.D. Ohio 2013) ("Notwithstanding the general acceptance of file reviews, particularly when completed by an independent vendor, the lack of a physical examination is particularly troublesome where, as here, the file reviewers make critical credibility determinations." (quotation marks omitted)). Likewise, a reviewer who simply summarizes the medical records and conclusively asserts the claimant's ability to work is inadequate. *Bennett*, 514 F.3d at 555.

Here, the issue is further complicated by the nature of a fibromyalgia diagnosis, which leaves medical practitioners largely without objective evidence on which to base their findings. As courts have explained previously, "[a] fibromyalgia diagnosis can be vexing because it cannot be confirmed by medical or laboratory testing and commonly turns on subjective reports of pain." *Holler v. Hartford Life & Accident Ins. Co.*, 737 F. Supp. 2d 883, 891 (S.D. Ohio 2010). The Sixth Circuit has acknowledged the difficulties of diagnosing fibromyalgia, noting that "[u]nlike most diseases that can be confirmed or diagnosed by objective medical tests, fibrositis can only be diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue." *Preston v. Sec'y of*

*Health & Human Servs.*, 854 F.2d 815, 817-819 (6th Cir. 1988). "In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results — a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease." *Id.*

Thus, the fact that the symptoms of fibromyalgia are almost entirely subjective is "of greatest importance to disability law." *Eastin v. Reliance Standard Life Ins. Co.*, No. 2012-140-WOB, 2013 WL 4648736, at *3 (E.D. Ky. Aug. 23, 2013) *affirmed*, 13-6247, 2014 WL 3397141 (6th Cir. July 10, 2014). However, "a diagnosis is not to be based exclusively on the patient's subjective complaints. Rather, it is "based upon observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and systematic elimination of other diagnoses." *Id.* (citations omitted); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x. 771, 778 (6th Cir. 2008) (noting that the standard for diagnosing fibromyalgia involves testing a series of focal points for tenderness and ruling out other possible conditions through objective medical and clinical trials).

Both Dr. VanderPutten and Dr. Green concluded that there was no objective evidence to support Hulst's claim. However, as noted above, on October 2, 2011, Dr. Arakawa's treatment notes indicate that "[Hulst] has all 18 of the fibromyalgia tender points as defined by the ACR criteria" and that she "fulfills the ACR criteria of fibromyalgia," including "ongoing fatigue and muscle pains." [AR, p. 257] Dr. Arakawa concluded by stating that "[Hulst] is disabled from

work." [AR, p. 257] Evidently, the absence of objective medical evidence supports both a positive *and* negative fibromyalgia diagnosis.

Aetna also relies upon the statement of Dr. Arakawa to a claims reviewer that the plaintiff is disabled because she says she is disabled. This reliance is also misplaced. Dr. Arakawa's treatment notes explain that, "in general it is true that I would have to go on what the patients tell me about what their level of pain is. Since fibromyalgia has no x-ray or laboratory confirmation of the diagnosis, we have to go by what the patients tell us. Pain is by the nature of it subjective." [AR, p. 257]

Prior to the final determination, Aetna hired an outside physician, Dr. Russell Green, to review the medical record. Dr. Green concluded:

> There is no support for functional impairments from 3/31/11 through the present and ongoing to 2/29/12. Ms. Linda Hulst, based on the reviewed medical data, is not precluded from working in her own medium level occupation during the time period in question. It may well be that Ms. Hulst is depressed and that she has degenerative changes in her neck and to a lesser extent in her back, but there is no convincing objective medical evidence in the medical records of Dr. Baloy, Dr. Arakawa, or Dr. McCaffrey that supports functional impairment for these conditions with regard to her medium duty position as a Marketing Executive with Marriott.

[AR, p. 333] On March 17, 2012, Dr. McCaffrey wrote to express his disagreement with Dr. Green's conclusions. [AR, pp. 335-36] However, in an April 25, 2012 addendum, Dr. Green reiterated that, in his opinion, "there is [sic] insufficient objective data to support clinical functional impairment." [AR, p. 232]

Aetna's determination of Hulst's disability status is based on and supported by the findings of Hulst's treating physicians, independent physician peer-review of medical records,

and a total lack of objective medical evidence of physical impairment. Hulst was given the opportunity to expand the administrative record with an FCE or Social Security disability documentation but declined to do so. Presented with dueling medical conclusions, each supported by the testimony of qualified physicians, Aetna relied upon one and rejected the other. Although the Court has noted defects in Aetna's examination process – as well as the complications of a fibromyalgia diagnosis – the record establishes a reasonable basis for the denial of benefits.

## IV.

The record does not support Hulst's contention that Aetna's determination was arbitrary and capricious. Instead, substantial evidence supports Aetna's decision which was the result of a reasoned and deliberative process. Accordingly, it is hereby

**ORDERED** as follows:

1. Plaintiff Linda Hulst's motion for judgment [Record No. 30] is **DENIED**.

2. Defendant Aetna Life Insurance Company's motion for judgment [Record No. 29] is **GRANTED**.

3. Defendant Aetna Life Insurance Company's decision regarding Plaintiff Hulst's claim for long-term disability benefits will be **AFFIRMED** by separate judgment entered this date.

This 15th day of September, 2014.



Signed By:
*Danny C. Reeves* DCR
United States District Judge